1

2

3

4

5

6

7

8                  **IN THE UNITED STATES DISTRICT COURT**

9              **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    ROBERT MARTINEZ,                         No. CIV S-08-1308-CMK

12                    Plaintiff,

13           vs.                               <u>MEMORANDUM OPINION AND ORDER</u>

14    COMMISSIONER OF SOCIAL
      SECURITY,
15
                      Defendant.
16    _____/

17           Plaintiff, who is proceeding with retained counsel, brings this action for judicial

18    review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

19           Pursuant to the written consent of all parties, this case is before the undersigned as

20    the presiding judge for all purposes, including entry of final judgment.  <u>See</u> 28 U.S.C. § 636(c).

21    Pending before the court are plaintiff's motion for summary judgment (Doc. 17) and defendant's

22    cross-motion for summary judgment (Doc. 20, 21).

23                        **I.  PROCEDURAL HISTORY**

24           Plaintiff applied for social security benefits on March 1, 2005.  Plaintiff claims

25    that his disability began on January 1, 2005.  In his application, Plaintiff claims that disability is

26    caused by a combination of bipolar disease, diabetes, left eye blindness, knee problems and

                                            1

arthritis.[1]  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on December 13, 2007, before Administrative Law Judge ("ALJ") L. Kalei Fong.   In a January 16, 2009, decision, the ALJ concluded that plaintiff is not disabled based on the following findings:

> 1.   The claimant has not engaged in substantial gainful activity since March 11, 2005, the application date (20 CFR 416.920(b) and 416.971 *et seq.*).
>
> 2.   The claimant has the following severe combination of impairments: left eye vision loss, degenerative joint disease of the right knee, non-insulin dependence diabetes mellitus, ADHD, and mild depression (20 CFR 416.920(c)).
>
> 3.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
>
> 4.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work except, occasional climbing ramps and ladders, stooping, balancing, kneeling and crawling; frequent stooping and crouching; no climbing ladders, ramps, scaffolds, and visual limitation in depth perception and avoid even moderate exposure to hazards of machinery and heights due to left eye low vision; and simple repetitive tasks.
>
> 5.   The claimant is unable to perform any past relevant work (20 CFR 416.965).
>
> 6.   The claimant was born on May 21, 1977 and is 30 years old, which is defined as a younger individual age 18-49 (20 CFR 416.963).
>
> 7.   The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).
>
> 8.   Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).
>
> 9.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).

---

[1]      In his motion, Plaintiff claims additional conditions to include diabetes, major depressive disorder, ADHD, migraine headaches, right knee posttraumatic degenerative disease, left eye blindness, hypertension, hyperlipidemia, and obesity.

1    After the Appeals Council declined review on April 11, 2008, this appeal followed.

2          Additional background review indicates Plaintiff had previously been found to be

3 disabled, as of December 1, 1987, due to Attention Deficit Hyperactivity Disorder (ADHD), that

4 decision having been rendered on October 28, 1991.  Following a Continuing Disability Review

5 (CDR) in 1999, it was determined his condition had not significantly improved, and that he had

6 additional injuries from a 1998 automobile accident.  A second CDR was conducted and in

7 February 2004 it was determined he was no longer disabled as of July 2003.  In a January 26,

8 2005, decision, ALJ Antonio Acevedo-Torres found Plaintiff's medical impairments, noted as

9 ADHD, right knee and leg, and left eye vision, had improved.  The ALJ found he had the residual

10 functional capacity (RFC) to perform the requirements of light work; he had the ability to

11 occasionally lift twenty pounds; frequently lift ten pounds, stand, or walk at least six of eight

12 hours and sit at least six of eight hours, but noted the visual limitations of his left eye.  Based on

13 that RFC, the ALJ found Plaintiff's disability ceased on July 1, 2003.

14                    **II.  SUMMARY OF THE EVIDENCE**

15         The certified administrative record ("CAR") contains the following medical

16 evidence as summarized in Plaintiff's motion for summary judgement.[2]

17       <u>Letter Report of Consultative Physician, Jenna Beech, M.D.</u> - May 18, 2005

18          On May 18, 2005, Mr. Martinez was seen by Dr. Beech for
an internal medicine evaluation.  His chief complaints were right

19 knee pain, headache, and bipolar disorder.  TR 260.  Mr. Martinez
rated his right knee pain at a 6 out of 10.  He stated "it is worse

20 with standing more than 15 minutes or walking more than a
block."  TR 260.  He explained that "it swells and locks up and

21 occasionally buckles because of weakness, causing him to fall."
TR 260.  He reported that he gets some pain relief from Tylenol.

22 TR 260.

23          Mr. Martinez reported that his headaches were real bad.  He
stated that they occurred 2-3 times week and lasted all day.  He

24 stated that they "sapped his energy."  TR 260.  He explained that

25 ─────────────────────

26     [2]    The medical evidence is not at issue in this case and is adequately summarized by
Plaintiff.  Defendant does not contest the accuracy of Plaintiff's summary.

he was only able to see light out of his left eye.  He described it as looking "up from the bottom of the ocean to the sky."  TR 260.  Mr. Martinez reported that he was unsure how long he had bipolar disorder but he was diagnosed in October of 2004 after he drove his truck into a tree.  TR 261.

Dr. Beech described Mr. Martinez as obese.  He weighed 268 pound and his blood pressure was 130/100.  He reported that he lived with his parents and that he could "do simple cooking and his laundry."  TR 261.

Upon examination of his left eye, Dr. Beech noted that there was some periorbital scarring and deformity.  She also noted that his lid was tacked upward and his eye appeared larger.  TR 262.  Dr. Beech reported that he walked with a limp favoring his left leg.  She stated:

> The claimant does have scarring around his right knee region with some swelling that is 2 cm greater in circumference than in the left knee. He does have tenderness to palpation over the entire knee joint as well as crepitus.

TR 262.

Dr. Beech diagnosed Mr. Martinez with:

> 1.  Right knee pain status post accident and surgery with tenderness to palpation, crepitus, swelling, decreased range of motion, and weakness, also causing him to limp.
> 2.  History of headaches, possibly related to head trauma.
> 3.  Bipolar disorder with history of psychotic features
> 4.  Left eye blind secondary to injury.

TR 263.

In Dr. Beech's opinion, Mr. Martinez could stand/walk for six hours in an eight hour workday.  She reported that he could sit without limitations.  She noted that he could lift/carry 50 pounds occasionally and 25 pounds frequently.  Dr. Beech reported that he could bend with limitations, but . . . limits for stooping, and/or crouching occasionally.  TR 263.  She noted that he had workplace environmental limitations as he needed to avoid activities requiring binocular vision because of the blindness in his left eye.  TR 263.

/ / /

/ / /

/ / /

4

<u>Letter Report of Consultative Physician, Jeff Gray, M.D.</u> - May 26, 2005

On May 26, 2005, Mr. Martinez was seen by Dr. Gray for a psychiatric evaluation.  Mr. Martinez complained that he was depressed.  TR 268.  He reported that when he was 14 years of age his older brother was killed and he became very depressed.  He was treated with antidepressants until the age of 18.  He stated that he has had chronic knee pain and bad migraine headaches since his accident in 1998, which caused left eye blindness and required placement of a metal plate in his face.  TR 268.  Mr. Martinez believed that he became gradually depressed thereafter and in October of 2004 attempted suicide by driving his car into a telephone pole.  He reported that he is currently taking Lexapro at 20 mg. per day and Topamax at 200 mg at bedtime.  TR 269.

Mr. Martinez reported his Activities of Daily Living (ADL) as washing his clothes, watching television, and playing video games.  He noted that he lived with his parents, and his mother, father and brother maintained the house.  TR 269-270.  Dr. Gray reported that Mr. Martinez had no social life.  The majority of his time was spent with his daughter occasionally or his family at home.  Dr. Gray noted that he had a short attention span and could only concentrate for about ten minutes before he had to do something else.  TR 270.

Dr. Gray described Mr. Martinez as a male who had nervous mannerisms.  Dr. Gray noted that he looked around the room, fidgeted and moved frequently in his chair.  Dr. Gray stated that Mr. Martinez had rapid speech and that although he described himself as mellow, it was inconsistent with his nervous mannerisms and fidgeting.  TR 270.  Dr. Gray reported that Mr. Martinez could only repeat four digits forward and three in reverse.  In his opinion, Mr. Martinez had difficulty concentrating and retaining information. TR 270.

Dr. Gray diagnosed Mr. Martinez as:

| | |
|---|---|
| Axis I: | Depressive disorder NOS |
| Axis II: | Attention Deficit Hyperactivity Disorder (ADHD), combined type. |
| Axis III: | Left eye blindness, migraine headaches, right knee arthritis, non-insulin dependent diabetes mellitus, hypertension, and hypercholesterolemia. |
| Axis IV: | Stress - moderate to severe, chronic mental illness, chronic physical disability, and unemployment. |
| Axis V: | GAF 55. |

TR. 271.

/ / /

Dr. Gray discussed his opinion of Mr. Martinez prognosis:

> The claimant has chronic physical disabilities, chronic ADHD, and he has developed a significant depressive disorder, in part secondary to the two previously mentioned problems. He is currently in treatment and has improved somewhat. Although, some of his problems are not likely to get better in the next 12 months, his depression may improve, but this is difficult to predict. The claimant's ADHD is chronic. He may need additional treatment for this.

TR 271-272.

In his functional assessment, Dr. Gray noted:

> The claimant does have the ability to perform simple and repetitive tasks, as well as detailed and complex tasks. The claimant can accept instructions from supervisors. The claimant may have some difficulty with coworkers and the public because of his short attention span and difficulty attending to one thing for any length of time. The claimant could perform work activities on a consistent basis without special supervision. The claimant can maintain regular attendance in the workplace and he could complete a normal workday and workweek; however, depending on the job, he would have interruptions from this ADHD. The claimant should be able to deal with stress encountered in the competitive work environment.

TR 272.

Letter Report of Consultative Psychologist, Craig West, Psy.D. - February 13, 2007

On February 13, 2007, Mr. Martinez was seen by Dr. West for a psychological evaluation. Mr. Martinez reported that he had ADHD and other physical problems. TR 202. He also stated that he had few friends, did not enjoy extracurricular activities, and that he had a history of aggression towards others. TR 202.

In describing his daily activities, Mr. Martinez reported that he goes to bed about 10:00 p.m. and typically wakes up at 9:00 a.m. He reported that on a typical day he visits with friends, watches television, and spends time with his daughter. He stated that he was unable to complete household chores. TR 203. Mr. Martinez reported that he was nervous around people he was not familiar with and felt like he did not belong. He indicated that his

ability to relate to others was slightly impaired. TR 204.

It was Dr. West's opinion, that Mr. Martinez could perform work-related activities consistently in an eight hour workday.  He felt that Mr. Martinez could perform "very simple, concrete repetitive tasks." TR 204.  Dr. West opined that Mr. Martinez might have "mild difficulty interacting with others...due to irritability or frustration, although it is believed that no special or additional close supervision would be needed to assist Mr. Martinez in interacting with others in a work setting." TR 204.

Mr. Martinez denied a history of suicidal ideations even though his records indicated he attempted suicide.  He also reported that he occasionally consumed alcohol. TR 205.  Dr. West felt that his ability to relate to others was slightly impaired. TR 205.  Dr. West's DSM IV diagnosis of Mr. Martinez was:

|  |  |
|---|---|
| Axis I: | 314.01 Attention Deficit/Hyperactivity Disorder, Combined Type, per history. 296.36 Major Depressive Disorder, Recurrent, In Full Remission |
| Axis II: | No Diagnosis |
| Axis III: | Unknown |
| Axis IV: | Financial Difficulty. |
| Axis V: | GAF 70 |

TR 205.

Letter Report of Consultative Physician, John Tendall, M.D. - March 29, 2007

On March 29, 2007, Mr. Martinez was seen by Dr. Tendall for an internal medicine evaluation.  His chief complaints were right knee problem, headaches, no vision in left eye, and decreased concentration. TR 190.  Mr. Martinez's Activities of Daily Living (ADL's) included watching television, spending time with his daughter every other weekend, and talking to his parents with whom he resided. TR 191.  His medications included Glucophage, Avandia, Glyburide, Tylenol with codeine, and Prevacid. TR 191.

Dr. Tendall described Mr. Martinez as "an odd-appearing gentleman who walks in actually slightly slowly but fairly easily with an asymmetric gait." TR 191.  Dr. Tendall noted that he seemed nervous, grunted occasionally and moved around in his chair a lot. T R 191.  His weight was 256 pounds and his blood pressure was 145/96.  He had no vision in his left eye and had 20/50 in his right with lenses and 20/25 without lenses.  TR 191.  Dr. Tendall noted that it was uncomfortable for Mr. Martinez to be on his right leg. TR 192.

/ / /

Dr. Tendall diagnosed Mr. Martinez as:

1.  Status post fracture of the right knee and his face.
2.  Diabetes, questionable diagnosis of non-insulin dependent diabetes mellitus versus untreated insulin dependent.
3.  Multiple psychological problems. With his grunting and odd physical movements I question whether he might have Tourette's syndrome.

TR 193.

Dr. Tendall noted that he had a lot of psychological problems and real underlying problems with objective evidence of the same.  In his functional assessment of Mr. Martinez, it was his opinion that Mr. Martinez could stand and walk for two hours in a workday and sit for six hours.  He noted that he could lift and carry 10 pounds frequently and 20 pounds occasionally.  Dr. Tendall felt that Mr. Martinez had no bending, stooping, crouching or manipulative limitations.  Dr. Tendall also stated that he would have no relevant visual, communicative, or workplace environmental limitations.  TR 193.

**Treatment Records**

Colusa Indian Health Clinic

On February 8, 2005, Mr. Martinez was seen for a follow-up appointment regarding his diabetes.  Mr. Martinez stated that he had not been drinking for a couple of months.  He weighed 263 pounds which was a 13 pound increase from his prior visit.  The notes reflected that his diabetes was "fairly well controlled but could use some improvement."  TR 235.

On February 15, 2005, the record reflected that Mr. Martinez was seen for follow-up on his lab work.  The record noted that Mr. Martinez had a history of bipolar disease, Ethyl alcohol (ETOH) abuse and obesity.  TR 234.  Mr. Martinez weighed 265 pounds which was a 2 pound increase from his prior visit.  The record reflected that Mr. Martinez's assessment showed his diabetes was under "fairly good control," his bipolar disease seemed stabilized, there was ETOH abuse, and obesity."  TR 234.  Mr. Martinez was encouraged to exercise, terminate his use of alcohol, and to gain access to talk therapy.  TR 234.

On May 11, 2005, Mr. Martinez was seen for a follow-up appointment regarding his diabetes.  The record reflected that Mr. Martinez was continuing his psychopathology medications including Lexapro and Topamax.  TR 233.  Mr. Martinez blood pressure was 132/98 and he reported that his weight had increased

considerably since his last visit.  TR 233.  He was also taking Glucophage and Avandia.  He was assessed with 1) Diabetes Mellitus Type II in need of better control, 2) Obesity, and 3) History of bipolar disease and attempted suicide.  Mr. Martinez was advised to take and record his blood pressure over the next few weeks.  TR 233.

On July 1, 2005, Mr. Martinez was seen for a follow-up appointment.  The record reflected that his blood pressure was 118/80 and he weighed 266 pounds.  He had a random blood sugar of 299.  TR 232.  The notes stated that Mr. Martinez's diabetes was "in need of better control".  TR 232.  He was prescribed Glyburide as well.  TR 232.

On July 7, 2005, Mr. Martinez had a follow-up appointment.  The record reflected that he reported blood sugars in the mid to high 200's.  He weighed 264 pounds.  The notes reflected that Mr. Martinez's diabetes was "poorly controlled" and he had gastroesophageal reflux disease.  TR 231.

On July 14, 2005, the record reflected that Mr. Martinez reported that his blood sugar had ranged from the 220's to the 230's.  The notes stated that Mr. Martinez had an aversion to needles and preferred not to try insulin.  TR 230.  His weight was 266 pounds.  The record reflected that his diabetes was under poor control.  TR 230.

On July 28, 2005, the record reflected that Mr. Martinez reported that his blood sugar was consistently under the 180's.  The record noted a random blood sugar of 201.  TR 228.  Although Mr. Martinez denied suicidal or homicidal ideation, his mother had advised the clinic that he was severely depressed and had made gestures related to taking his life.  TR 228.  His weight was 265 pounds.  The record reflected that Mr. Martinez had stopped taking Depakote and Lexapro for depression and bipolar disorder.  The record noted that Mr. Martinez stated that "the medication made him feel tired, lethargic, and he felt it was counterproductive to his problem."  TR 228.  He had also stopped attending his mental health sessions.  He felt they had not been effective.  TR 228.

From August 22, 2005 through September 13, 2007, the record reflected that Mr. Martinez continued to have problems with diabetes mellitus type II, hyperlipidemia, bipolar disorder, obesity, alcohol abuse and gastroesophageal reflux disease.  TR 173-179, 219-227.

On August 22, 2005, the record reflected that Mr. Martinez weighed 264 pounds.

On October 13, 2005, Mr. Martinez complained of right knee pain that spread to the thigh and then toward the foot.  He

stated that the pain kept him up at night. He reported that this had been going on for approximately one month. He weighed 254 pounds and had a random glucose of 161. TR 226. The record reflected that Mr. Martinez had slight tenderness on the medial condyle and towards the medial plateau. Dr. James Barrett, M.D., noted that the "anterior drawer was minimally positive and there was slight laxity to the MCL." TR 226. The record also showed that there was fairly marked crepitus with extension/flexion. Mr. Martinez felt that he was okay without his medications for his bipolar disorder. TR 226. Dr. Barrett assessed "traumatic arthritis right knee now increasingly symptomatic." TR 226.

On November 29, 2005, Mr. Martinez weighed 258 pounds which was an increase of four pounds from the prior visit. TR 225. He reported that the Vicodin helped to keep the pain under control and he was less irritable. TR 225. Mr. Martinez had a random blood glucose of 200. TR 225. His cholesterol level was 219 and his triglycerides level was 400. TR 225.

On March 28, 2006, the record reflected that Mr. Martinez complained of pain in his knee. He rated the pain at a 7 out of 10. His weight was 275 pounds which was 15 pounds up from his prior visit in November of 2005. He had a random glucose of 80. TR 224. When Dr. Barrett questioned him in regards to exercise, Mr. Martinez reported that he could walk at a fair pace but his knee would hurt that evening. TR 224. Mr. Martinez was having increased dyspepsia. Dr. Barrett noted that he had arthritic changes in the knee from his previous fracture. TR 224. Mr. Martinez was assessed with chronic knee pain from a previous injury. He was prescribed Tylenol with codeine and Voltaren. TR 224.

On May 2, 2006, Mr. Martinez had a follow-up appointment. He reported that he was drinking again. He stated that he stopped taking his medication because if he was drinking it made him sick. He reported that he had been in the emergency room for increased back pain. He stated that his back would flair up every six months or so. His weight was 270 pounds and he had a random blood glucose of 107. The record reflected that his lab report from April 25, 2006, showed a cholesterol of 238 and triglycerides of 407. Dr. Barrett increased his Lipitor to 40 mg. TR 223.

On July 19, 2006, Mr. Martinez was seen for emergency room follow-up. He had some head trauma from a fight with his brother. The record reflected that he had experienced some blurred vision as well as headaches. TR 221. His weight was 269 pounds. He was assessed with left temporal contusion- resolving and diabetes mellitus. TR 221. The record reflected that "given his hgbA1C was slowly creeping up from a controlled 7 to a now 7.5 with his last labs that he will eventually be a candidate for insulin." TR 221.

On August 24, 2006, Mr. Martinez was seen for follow-up with his diabetes and hyperlipidemia.  The record reflected that Mr. Martinez was drinking again.  He reported that he was binge drinking and at times drinking every other day.  TR 220.  He stated that he continued to have left upper quadrant pain.  He reported that he was not taking his medications regularly consistently missing his Glyburide and not taking his Lipitor that much.  His weight was 270 pounds and he had a random blood glucose of 314.  The record noted that his lab work from August 9, 2006, showed a cholesterol of 315 and triglycerides of 1086.  Dr. Barrett advised Mr. Martinez to get on a regular medication regimen.  TR 220.

On October 3, 2006, Mr. Martinez was seen for follow-up appointment.  He reported that the Glucophage bothered his stomach so he tended to miss taking it.  He stated that he was binge drinking, especially on the weekends.  He advised that he had always been short tempered and had taken Ritalin up to the age of 15. TR 219.  His weight was 277 pounds and he had a random blood glucose of 320.   He also complained of right knee pain.  TR 219.  Dr. Barrett noted that his hyperlipidemia needed improvement, his obesity was somewhat worse, he had chronic pain, and problems with alcoholism.  TR 219.

On April 26, 2007, the record reflected that Mr. Martinez complained of knee pain.  He felt that it was worsening.  He reported that he had several episodes of knee buckling and falling.  He rated the pain at a 6-7 out of 10.  The record reflected the exam of the right knee showed a possible effusion.  TR 179.  He weighed 260 pounds and had a random blood glucose of 237.  Dr. Barrett assessed diabetes not to target, chronic knee pain, dyspepsia, and allergic rhinitis.  TR 179.

On April 27, 2007, the record reflected that Mr. Martinez had an x-ray of the right knee.  The impression was "deformity and posttraumatic changes involving the distal right femur.  Early posttraumatic degenerative disease."  TR 178

On May 17, 2007, the record reflected that Mr. Martinez complained of knee pain.  He rated the pain at a 4 out of 10.  The record noted that his x-ray showed posttraumatic changes as well as new degenerative arthritic changes.  The record reflected that his lipids were bad with cholesterol of 387 and triglycerides of 1102.  His A1C had increased to 9.7.  TR 175.  His weight was 263.9 and he had a random glucose level of 189.  Dr. Barrett assessed "diabetes poor control, posttraumatic arthritis of the right knee, and severe hyperlipidemia."  TR 175.  Mr. Martinez was prescribed TriCor and his Glucophage prescription was increased to 850.  TR 175.

On June 28, 2007, Mr. Martinez was seen for a follow-up appointment.  His weight was 269.5 which was up from his prior

visit.  His blood pressure was 140/91.  The record noted a random glucose level of 313.  Dr. Barrett assessed, hyperlipidemia somewhat improved, diabetes not to target, hypertension with exacerbation and chronic knee pain.  TR 173.

On August 2, 2007, Mr. Martinez was seen for a follow-up appointment.  He reported that he was feeling more depressed and stressed because his girlfriend had left him.  He stated that he had been doing a lot of binge eating since he had stopped binge drinking.  The record reflected that he had the occasional beer and had only been drunk twice over the last month.  Mr. Martinez reported that he refused to go back to Mental Health as all they do is "pump him up full of drugs."  TR 168. He weighed 263 pounds, his blood pressure was 143/96, and he had a random blood sugar level of 254.  Dr. Barrett assessed that the hyperlipidemia was improving, increased ALT, diabetes slightly improved, and situational anxiety.  TR 168.

On September 13, 2007, Mr. Martinez was seen for follow-up with his diabetes and hyperlipidemia.  He weighed 269 pounds and his blood pressure was 141/94.  The record reflected a random blood glucose of 386.  Dr. Barrett assessed diabetes not to goal, hyperlipidemia in need of improvement, obesity worse, hypertension not to target, and increased ALT.  TR 166.

From February 8, 2005, through September 11, 2007, Mr. Martinez's lab reports showed consistently high cholesterol, high triglycerides, and high glucose levels.

| Date | Cholesterol [FN1] | Triglycerides [FN2] | Glucose [FN3] | |
|------|------------|---------------|---------|---|
| 2/08/05 |  |  | 155 | (TR 218) |
| 5/12/05 | 333 | 662 | 193 | (TR 216) |
| 8/23/05 | 248 | 677 | 160 | (TR 214) |
| 11/21/05 | 219 | 400 | 163 | (TR 212) |
| 4/25/06 | 238 | 407 | 126 | (TR 210) |
| 8/09/06 | 315 | 1096 | 218 | (TR 208) |
| 9/28/06 | 265 | 948 | 218 | (TR 206) |
| 5/03/07 | 387 | 1102 | 199 | (TR 176) |
| 6/25/07 | 212 | 506 | 256 | (TR 174) |
| 7/26/07 | 199 | 331 |  | (TR 169) |
| 9/10/07 | 245 | 673 |  | (TR 167) |

[FN1: The normal range for cholesterol is 125-200.]
[FN2: The normal range for triglycerides is less than 150.]
[FN3: The normal range for glucose is 65-90.]

Colusa County Mental Health Records

On February 8, 2005, the record reflected that Mr. Martinez weighed 263 pounds.  He felt that he did not need a residential rehabilitation facility for his alcoholism.  He stated that he had

been sober for two months.  The record reflected that he was diagnosed with a depressive disorder.  TR 318.

On March 18, 2005, the record reflected that Mr. Martinez had a problematic relationship with his mother and reported that he drank a lot of beer.  The record reflected that he presented "as if he really wants to get his life together this time."  TR 301.

On March 22, 2005, the record reflected that Mr. Martinez weighed 263 pounds.  He reported that his medications were working and that he felt great.  He reported no thoughts of suicide or anger.  The record noted that his sleep pattern was stable with some occasional periods of reduced sleep.  The record reflected a diagnosis of Depressive disorder NOS.  His medications were Lexapro at 10 mg. and Topamax at 200 mg. TR 317.

(Pl.'s Mot. at 2-11).

**<u>Hearing Testimony</u>**

The administrative hearing was held on December 13, 2007.  Plaintiff's testimony at the hearing is summarized below.  (CAR 344-63).

Plaintiff testified that he was thirty years old at the time of the hearing, is a high school graduate with about a year of college.  He had last been incarcerated for a few weeks the year before due to fines he could not afford to pay.  Due to his depression and bipolar disorder, for which he was unable to get the necessary treatment due to financial and transportation problems, he fell into drinking as a way of dealing with his problems.  He did not consider his drinking to be that much of a problem, but his doctor told him that it was causing his health to decline so he stopped drinking several months prior to the hearing.  In response to a question about why he was unable to work, he stated "I don't think that I'm physically able to due to the tremendous amount of pain that I'm in.  If I'm not heavily medicated then I'm not able to function."  (CAR 349).  His pain includes knee pain and migraine headaches.  He also suffers from mood swings, is not mentally stable, and is unable to function in society, deal with his emotions or his anger issues.  He is not exercising to reduce his weight due to his pain.  He stated "I'm not on my feet very often and I'm not, I can't sit for long periods of time.  I got to, you know, get up and stretch every now and then.  But, as far as doing more than five, 10 minutes

13

1  walking or anything, it'll just, I'll pay for it later.  My knee will swell up.  I'll be in a tremendous

2  amount of pain.  I'll have to double up on my pain killers." (CAR 350).

3             He goes fishing with his friends maybe once a month, if that, but is unable to go

4  for an all day trip, rather only for maybe an hour at a time.  He goes out with his friends every

5  now and then, he does not confine himself to the house all day.  But he does not like to be out in

6  large crowds or society.  "I'm anti-social." (CAR 350).  He is receiving very limited treatment

7  for his knee due to lack of insurance and lack of local doctors, especially specialists.  His

8  diabetes is out of control.  It is hard for him to take care of himself, like diet, because he has to

9  eat whatever is presented to him and cooked for him by his family.  He is living with family for

10  free, so he doesn't complain very much about the food.

11             The ALJ asked "So why, you don't think you could at least work some type of job

12  where you're not on your knees a lot?  Get out and be active?"  Plaintiff responded "I'm not

13  trained to do anything else but what I used to do. . . . manual, physical labor." (CAR 352).  In

14  addition, he stated "I'm not mentally stable." (CAR 352).  He was not currently seeing anyone

15  for his mental problems due to financial and transportation difficulties given the doctors are

16  twenty to thirty miles away.  He had seen counselors in the past, but they told him they could not

17  help him, he is beyond their help, and they did not want to see him anymore.  "I irritate them."

18  (CAR 353).

19             He has had mental problems including ADD since he was a young child.  He has

20  had the mental problems since kindergarten, has been on Ritalin, Cylert, and all the anti-ADD

21  drugs.  His past drinking was binge drinking when it was available.  He would drink until he felt

22  better or passed out.  But he stopped drinking in August 2007, when the doctor stressed his

23  declining health.

24             Plaintiff has a drivers licences, and does drive but only when he has to.  The only

25  restriction on his license is his need to wear glasses.  He was in an accident in 1998, resulting in

26  facial fractures.  He has been in a tremendous amount of pain since, he is blind out of his left eye,

1    his knee gives out, and he has serious migraine headaches.  He is on medication for pain, which

2    make him drowsy.  The medication does help with the pain and his mood.  He has cut himself off

3    from society since he has been unable to see "shrinks" and take anti-social medication or bipolar

4    medication.  People tend to irritate him, he has an attitude about it and he tends to snap, rant, and

5    get violent.  He visits with people maybe twice a month.  His daughter stays with him every other

6    weekend, but his mom has to help out with his daughter because she is a handful and there are

7    times he can't deal with her.

8            He stated he only tests his blood sugar when he feels sick because he is scared of

9    needles.  He gets an AC1 every six weeks, which is a blood test that shows average sugar levels.

10   They are always above normal.  His triglycerides levels are also "out of control."  His blood

11   pressure and cholesterol are also high.

12           In August 2007, Plaintiff went to the lake, thirty to forty miles away, with friends

13   who had a fifth wheel and were able to accommodate him.  He went for a couple of days, then

14   could not stand it anymore and he came home.

15           The only doctor he was seeing was Dr. Barrett.  He used to see Dr. Barrett in

16   town, but the clinic closed down so he has to drive twenty miles to see him, each way.  He is

17   seeing Dr. Barrett for diabetic medication.

18           He used to visit with friends every day, but it fluctuates.  Sometimes his friends

19   come over and he will hang out with them, sometimes he will ignore them because he wants to

20   be alone.  It depends on his mood.  There is no typical day for him.  He spends as much time with

21   his daughter as he can, but only when she is with him, which is every other weekend not every

22   day.

23                                    **III.  STANDARD OF REVIEW**

24           The court reviews the Commissioner's final decision to determine whether it is:

25   (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

26   whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is

more than a mere scintilla, but less than a preponderance.  <u>See Saelee v. Chater</u>, 94 F.3d 520, 521 (9th Cir. 1996).  It is "such evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  <u>See Howard v. Heckler</u>, 782 F.2d 1484, 1487 (9th Cir. 1986); <u>Jones v. Heckler</u>, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  <u>See Hammock v. Bowen</u>, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive.  <u>See Sprague v. Bowen</u>, 812 F.2d 1226, 1229-30 (9th Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, <u>see Thomas v. Barnhart</u>, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, <u>see Burkhart v. Bowen</u>, 856 F.2d 1335, 1338 (9th Cir. 1988).

## IV.  DISCUSSION

Plaintiff argues the ALJ erred in two ways: (1) failure to credit Plaintiff's testimony and third party statements; and (2) failure to properly assess Plaintiff's RFC and utilizing the GRIDS without the testimony of a vocational expert.

### A.     CREDIBILITY

Plaintiff argues the ALJ improperly discredited his testimony because he did not believe the alleged degree of Plaintiff's pain and functional limitations.  In addition he argues the ALJ improperly discredited his third party statements regarding his abilities.

1.     <u>Plaintiff's Credibility</u>

The Commissioner determines whether a disability applicant is credible, and the court defers to the Commissioner's discretion if the Commissioner used the proper process and

1   provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit

2   credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

3   F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d

4   821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

5   and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

6   evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

7   credible must be "clear and convincing."  See Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883

8   (9th Cir. 2006); see also Carmickle v. Commissioner, 533 F.3d 1155, 1160 (9th Cir. 2008) (citing

9   Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007), and Gregor v. Barnhart, 464 F.3d

10   968, 972 (9th Cir. 2006)).

11            If there is objective medical evidence of an underlying impairment, the

12   Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

13   because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

14   341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

15                    The claimant need not produce objective medical evidence of the
                [symptom] itself, or the severity thereof.  Nor must the claimant produce
16              objective medical evidence of the causal relationship between the
                medically determinable impairment and the symptom.  By requiring that
17              the medical impairment "could reasonably be expected to produce" pain or
                another symptom, the Cotton test requires only that the causal relationship
18              be a reasonable inference, not a medically proven phenomenon.

19   80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in Cotton v. Bowen, 799

20   F.2d 1403 (9th Cir. 1986)).

21            The Commissioner may, however, consider the nature of the symptoms alleged,

22   including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell,

23   947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the

24   claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

25   testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a

26   prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5)

17

1   physician and third-party testimony about the nature, severity, and effect of symptoms.  See

2   Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the

3   claimant cooperated during physical examinations or provided conflicting statements concerning

4   drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the

5   claimant testifies as to symptoms greater than would normally be produced by a given

6   impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See

7   Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

8           In this case, as to Plaintiff's credibility, the ALJ stated:

9               After considering the evidence of record, the undersigned
            finds that the claimant's medically determinable impairments could
10           reasonably be expected to produce the alleged symptoms, but that
            the claimant's statements concerning the intensity, persistence and
11           limiting effects of these symptoms are not entirely credible.
            (CAR 17-18).
12
        In support thereof, the ALJ found:
13
                Although the claimant alleges few activities, as shown in
14           record and summarized in the B criteria, the claimant's activities
            are wide, including playing computer games, watching television,
15           socializing with friends and going on fishing trips.  Therefore
            despite his allegations of symptoms and limitations preventing all
16           work, the record reflects that he leads a rather active and full life,
            as one would expect for a person of his age.
17               The minimal findings and the very limited and conservative
            treatment do not support the extreme limitations alleged by the
18           claimant.  His activities of daily living are generally consistent with
            the limitations in the assessed residual functional capacity.
19           (CAR 19).

20          Plaintiff argues the ALJ did not believe the degree of pain and limitations Plaintiff

21   testified to, which is exactly the type of reasoning the Ninth Circuit has found to be erroneous.

22   He argues the ALJ's decision failed to consider his difficulty in getting along with his family, his

23   testimony that he did not participate in his hobbies (fishing and sports) anymore, that his

24   activities were actually quite limited, his testimony that he was antisocial and only occasionally

25   socialized, and that his ability to sit and watch TV or play computer games on occasion was not

26   inconsistent with a finding of disability.

18

Defendant points out that the ALJ also supported his credibility finding based on Plaintiff's failure to obtain mental health treatment, that his claims of pain were contradicted by the recommendations by his treating physician that he walk for 20 minutes a day or ride his bike, his activities contradicted his pain complaints, he failed to follow prescribed treatment such as diet, exercise, and limiting alcohol, and he exaggerate his symptoms during his consultative examination.

The ALJ set forth specific reasons for finding Plaintiff's testimony not entirely credible. As mentioned above, the ALJ found the "B criteria" did not support his claims. As to the "B criteria" the ALJ found Plaintiff has only mild difficulties and restrictions in his activities of daily living. The ALJ found Plaintiff is capable of taking care of his personal needs, participates in activities with his family such as meals and conversations, goes grocery shopping once a month, clothes shopping when needed, and goes on fishing trips. The ALJ found moderate difficulties in regards to his concentration, persistence or pace, noting he watches television and plays computer games, does not take medication for ADHD, is able to drive and likes to fish. He also notes no episodes of decompensation. (CAR 16).

The undersigned finds the specific reasons set forth for discrediting Plaintiff's testimony are clear and convincing. While the ALJ could have stated the reasons and supporting findings more concisely, the reasons and supporting findings are in the opinion and supported by the record. The ALJ supported his credibility determination with specific reasons including failure to follow recommended treatment, refusing treatment, wide ranging activities of daily living, and limited and conservative treatment. Such reasons are clear and convincing, and supported by the record. The court defers to the Commissioner's discretion, and will not disturb that finding.

2.    Witness Credibility

Plaintiff also argues the ALJ erred by not considering his mother's statements as to his daily activities. He argues his mother's statements support his claims of limited daily

19

1    activity which the ALJ failed to address.

2            In determining whether a claimant is disabled, an ALJ generally must consider lay

3    witness testimony concerning a claimant's ability to work.  See Dodrill v. Shalala, 12 F.3d 915,

4    919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e).  Indeed, "lay

5    testimony as to a claimant's symptoms or how an impairment affects ability to work is competent

6    evidence . . . and therefore cannot be disregarded without comment."  See Nguyen v. Chater, 100

7    F.3d 1462, 1467 (9th Cir. 1996).  Consequently, "[i]f the ALJ wishes to discount the testimony

8    of lay witnesses, he must give reasons that are germane to each witness."  Dodrill, 12 F.3d at

9    919.  Inconsistency with medical evidence a valid reason for discrediting the testimony of lay

10   witnesses.  See Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005).

11           The ALJ, however, need not discuss all evidence presented.  See Vincent on

12   Behalf of Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984).  Rather, he must explain

13   why "significant probative evidence has been rejected." Id. (citing Cotter v. Harris, 642 F.2d 700,

14   706 (3d Cir.1981).   As to lay witness testimony, if that testimony is controverted by the medical

15   evidence, then the ALJ does not err by ignoring it.  See Vincent, 739 F.2d at 1395.  If, however,

16   lay witness testimony is consistent with the medical evidence, then the ALJ must consider and

17   comment upon it.  See Stout v. Commissioner, 454 F.3d 1050, 1053-54 (9th Cir. 2006).

18           Here, the ALJ did consider and comment on some of Plaintiff's mother's

19   statements.  He specifically stated "[a]lthough his mother reports that he has never outgrown his

20   hyperactivity, there is little evidence contained in the record to show that he has ADHD which

21   would prevent work activity."  While the ALJ did not comment on all of Plaintiff's mother's

22   statements, he was not required to do so.  Plaintiff argues his mother indicated he does not handle

23   stress very well, his behavior is very bad, he has problems with social activities, his concentration

24   is bad, he does not get along with authority figures, he is limited in his mobility, and has

25   difficulty getting along with people, and that the ALJ's failure to consider this evidence was

26   erroneous.

1    The ALJ's failure to remark on all of these statements is erroneous only if they are
2    probative and are not contradicted by the record.  Most of these statement are contradicted, and
3    the ALJ's failure to address them was therefore not erroneous.  Specifically, the ALJ found the
4    2007 internal medicine consultative examination was within normal limits, Plaintiff exaggerated
5    his symptoms, and the physician found him capable of standing and walking for two hours,
6    sitting for six hours, lifting and carrying ten pounds frequently and twenty pounds occasionally
7    with no limitations in bending, stooping or crouching.  (CAR 19).  This is in addition to his
8    treating physician's recommendation that he walk or ride his bike on a daily basis.  As to his
9    ability to get along with others and his ability to concentrate, the ALJ noted the 2007
10   psychological consultative examination was also within normal limits, and Plaintiff was assessed
11   with the ability to perform simple, repetitive tasks, with only a sight impairment in his ability to
12   relate to others.

13   As the statements from Plaintiff's mother were largely contradicted by the
14   medical evidence in the record, the undersigned finds no error in the ALJ failure to address all of
15   Plaintiff's mother's statements specifically.

16   **B.**     **RESIDUAL FUNCTIONAL CAPACITY**

17   Plaintiff also argues the ALJ erred in assessing his RFC, utilizing the GRIDS, and
18   not securing the testimony of a vocational expert (VE).

19   1.     <u>ASSESSMENT</u>

20   Plaintiff first argues the ALJ erred in assessing his RFC.  The ALJ acknowledged
21   that the previous decision denying Plaintiff benefits "found that the claimant had the residual
22   functional capacity to perform a wide range of light work . . . ."  (CAR 18).  In addition, the ALJ
23   stated:

24        The current record contains essentially the same clinical
           findings as those in the prior record.  Although a new impairment
25        of diabetes was diagnosed, the evidence shows that the claimant's
           treatment is basically the same.  He has not been referred to any
26        specialist or physical therapy nor has he been treated at the

emergency room, required any hospitalization, nor has surgery been recommended since the prior decision.  The claimant's medications remain virtually the same, with the exception of diabetes medication, and there is no evidence of any significant change in his disorders.  The claimant's diabetes imposes no functional limitation outside of that contained in the established residual functional capacity.
. . .
      As for the opinion evidence, there are no treating source opinions.  Disability Determination Service sources and Dr. Tendall assessed limitations more consistent with the ability to perform sedentary work.  However, as noted above, the clinical findings in the record, and the treatment received by the claimant are essentially the same [as] contained in the record at the time of the prior decision.  Thus, the residual functional capacity from the prior decision will be adopted.  It is also noted that the current sources assessed that in addition to simple repetitive tasks, the claimant was also capable of performing complex tasks with minimal public contact.  Regarding the minimal public contact limitations, the current record contains no evidence that the claimant has more than a mild limitation in dealing with people, and therefore this limitation is rejected.  As far as the ability to perform complex tasks, there is no change from the time of the prior decision that warrants this change, and this too is rejected.
      Thus based on the minimal clinical findings, the conservative intermittent treatment, and the claimant's wide variety of activities, it is found that the record strongly supports a conclusion that he can perform a wide range of light work.
(CAR 19-20)

This resulted in a finding that Plaintiff has the

residual functional capacity to perform light work except, occasional climbing ramps and ladders, stooping, balancing, kneeling and crawling; frequent stooping and crouching; no climbing ladders, ramps, scaffolds, and visual limitation in depth perception and avoid even moderate exposure to hazards of machinery and heights due to left eye low vision; and simple repetitive tasks.  (CAR 16-17).

      Plaintiff argues the ALJ erred in his RFC determination.  Specifically, Plaintiff states the ALJ erred in rejecting the limitations set forth by Dr. Tendall and the Social Security doctors, Plaintiff's impairments and treatment are not the same as those prior to the January 2005 decision, there have been additional clinical findings since the prior decision, and his obesity has worsened.

      To the extent Plaintiff is arguing the ALJ erred in his treatment of the medical

1  opinions, that argument is not fully developed.  However, the undersigned notes that where there

2  are conflicting consultative medical opinions based on independent clinical findings in the

3  record, such as here, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53

4  F.3d 1035, 1041 (9th Cir. 1995).  The court finds no error in the ALJ's treatment of the medical

5  opinions in the record.  To the extent the ALJ rejected the more restrictive opinion of Dr. Tendall

6  in favor of another consultative medical opinion, that decision is not erroneous in that the ALJ

7  had the ability to resolve the conflicting medical opinions.  The ALJ noted that in addition to Dr.

8  Tendall's consultative examination, Dr. Beech conducted an examination wherein Plaintiff was

9  assessed with the ability to stand and walk six hours, sit without limitation, and lift and carry

10  twenty-five pounds frequently and fifty pounds occasionally.  (CAR 18).

11       As to the ALJ's treatment of Plaintiff's ability to interact with others, the ALJ

12  discussed both Dr. Gray and Dr. West's opinion that Plaintiff is minimally impaired in his ability

13  to relate to others.  As the impairment was determined by both consulting physicians as only a

14  mild or minimal impairment, the ALJ rejected that as a limitation.  This decision was not

15  erroneous.

16       In addition, as Defendant correctly points out and the ALJ discussed, the prior

17  finding that Plaintiff is not disabled as of July 1, 2003, invokes a presumption of continuing non-

18  disability.  The burden is on Plaintiff to rebut this presumption by showing a change in

19  circumstances.  See Chavez v. Bowen, 844 F.2d 691 (9th Cir. 1988).  In this case, the changed

20  circumstances included a new impairment not previously addressed, diabetes.  However, the ALJ

21  found the new impairment did not have any limitations on his abilities.   In addition, Plaintiff

22  argues his obesity has gotten worse.  However, he does not argue, nor is there any medical

23  support for the idea that his obesity has impaired his ability to work.  Plaintiff fails to meet his

24  burden in showing his circumstances have changed since the previous denial.  The findings by

25  the ALJ are supported by substantial evidence in the record and are not erroneous.

26  / / /

1          2.     GRIDS vs. VOCATIONAL EXPERT

2          Finally, Plaintiff argues the ALJ erred in utilizing the GRIDS instead of the

3  testimony of a vocational expert due to his non-exertional limitations.

4          The Medical-Vocational Guidelines ("Grids") provide a uniform conclusion about

5  disability for various combinations of age, education, previous work experience, and residual

6  functional capacity.  The Grids allow the Commissioner to streamline the administrative process

7  and encourage uniform treatment of claims based on the number of jobs in the national economy

8  for any given category of residual functioning capacity.  See Heckler v. Campbell, 461 U.S. 458,

9  460-62 (1983) (discussing creation and purpose of the Grids).

10         The Commissioner may apply the Grids in lieu of taking the testimony of a

11 vocational expert only when the Grids accurately and completely describe the claimant's abilities

12 and limitations.  See Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985); see also Heckler v.

13 Campbell, 461 U.S. 458, 462 n.5 (1983).  Thus, the Commissioner generally may not rely on the

14 Grids if a claimant suffers from non-exertional limitations because the Grids are based on

15 exertional strength factors only.[3]  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(b).

16 "If a claimant has an impairment that limits his or her ability to work without directly affecting

17

18         [3]     Exertional capabilities are the primary strength activities of sitting, standing,
19 walking, lifting, carrying, pushing, or pulling and are generally defined in terms of ability to
   perform sedentary, light, medium, heavy, or very heavy work.  See 20 C.F.R., Part 404, Subpart
   P, Appendix 2, § 200.00(a).  "Sedentary work" involves lifting no more than 10 pounds at a time
20 and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  See 20
   C.F.R. §§ 404.1567(a) and 416.967(a).  "Light work" involves lifting no more than 20 pounds at
21 a time with frequent lifting or carrying of objects weighing up to 10 pounds.  See 20 C.F.R. §§
   404.1567(b) and 416.967(b).  "Medium work" involves lifting no more than 50 pounds at a time
22 with frequent lifting or carrying of objects weighing up to 25 pounds.  See 20 C.F.R. §§
   404.1567(c) and 416.967(c).  "Heavy work" involves lifting no more than 100 pounds at a time
23 with frequent lifting or carrying of objects weighing up to 50 pounds.  See 20 C.F.R. §§
   404.1567(d) and 416.967(d).  "Very heavy work" involves lifting objects weighing more than
24 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.
   See 20 C.F.R. §§ 404.1567(e) and 416.967(e).
25         Non-exertional activities include mental, sensory, postural, manipulative, and
   environmental matters which do not directly affect the primary strength activities.  See 20 C.F.R.,
26 Part 404, Subpart P, Appendix 2, § 200.00(e).

24

1    his or her strength, the claimant is said to have non-exertional . . . limitations that are not covered

2    by the Grids." Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., Part 404,

3    Subpart P, Appendix 2, § 200.00(d), (e)).  The Commissioner may, however, rely on the Grids

4    even when a claimant has combined exertional and non-exertional limitations, if the non-

5    exertional limitations do not impact the claimant's exertional capabilities.  See Bates v. Sullivan,

6    894 F.2d 1059, 1063 (9th Cir. 1990); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988).

7              In cases where the Grids are not fully applicable, the ALJ may meet his burden

8    under step five of the sequential analysis by propounding to a vocational expert hypothetical

9    questions based on medical assumptions, supported by substantial evidence, that reflect all the

10   plaintiff's limitations.  See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995).  Specifically,

11   where the Grids are inapplicable because plaintiff has sufficient non-exertional limitations, the

12   ALJ is required to obtain vocational expert testimony.  See Burkhart v. Bowen, 587 F.2d 1335,

13   1341 (9th Cir. 1988).

14             Here, as discussed above, the ALJ found Plaintiff had no significant non-

15   exertional limitations.  Plaintiff reasserts his argument that the ALJ findings were contrary to the

16   evidence.  However, the court finds the ALJ's findings are supported by the record.

17             The ALJ found Plaintiff capable of performing light work, with limitations in his

18   ability to stoop, balance, kneel, crawl, climb, and see, plus only simple repetitive tasks.  The ALJ

19   utilized the Grids based on this RFC, plus considering Plaintiff's age, education, and work

20   experience.  In so doing, the ALJ noted that "the additional limitations have little or no effect on

21   the occupational base of unskilled light work." (CAR 21).  The ALJ noted that:

22             Unskilled work involves little or no judgment to do simple duties
              that can be learned on the job in a short period of time. . . . In
23            addition, unskilled jobs ordinarily involve dealing primarily with
              objects, rather than with data or people, and they generally provide
24            substantial vocational opportunity for persons with only mental
              impairments who retain the capacity to meet the intellectual and
25            emotional demands of unskilled work on a sustained basis."
              (CAR 21).

26

1    Plaintiff continues to argue that he has limitations over and above those the ALJ

2    determined, including walk/stand limitations, postural limitations, impaired ability to

3    concentrate, and impaired ability to get along with people.  He also appears to argue a limitation

4    in his ability to sit for a time without getting up and standing or walking, as required for even

5    sedentary work.  A review of the medical opinions fails to show where any medical opinion

6    indicated a significant limitation in his ability to sit.  Even Dr. Tendall opined that Plaintiff was

7    able to stand and walk for two hours in an eight-hour day, and sit for six hours in an eight-hour

8    day.  The undersigned has already found the ALJ did not err in his determination that Plaintiff

9    has no substantial non-exertional limitations.  As use of a vocational expert is only required

10   where there exits substantial non-exertional limitations, the ALJ did not err in utilizing the Grids

11   instead of relying on the testimony of a vocational expert.

## V.  CONCLUSION

13   Based on the foregoing, the court concludes that the Commissioner's final

14   decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY

15   ORDERED that:

16          1.      Plaintiff's motion for summary judgment (Doc. 17) is denied;

17          2.      Defendant's cross-motion for summary judgment (Doc. 20, 21) is granted;

18   and

19          3.      The Clerk of the Court is directed to enter judgment and close this file.

21   DATED:  March 26, 2010

23   CRAIG M. KELLISON
     UNITED STATES MAGISTRATE JUDGE

26